

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00703-CV

_____

IN THE INTEREST OF R.G. III, A CHILD

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CP2024-1690

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

## I. INTRODUCTION

Following a jury trial, the trial court terminated the parent–child relationship between Appellant R.G. II (Father) and his son R.G. III (Ryan).[1]  The jury found that (1) the Texas Department of Family Protective Services (the Department) made reasonable efforts to return Ryan to Father, and despite those reasonable efforts, a continuing danger remained in the home that prevented his return; (2) Father knowingly placed or knowingly allowed Ryan to remain in endangering conditions and engaged in conduct or knowingly placed Ryan with persons who engaged in endangering conduct; and (3) termination of the parent–child relationship between Father and Ryan was in Ryan's best interest.  *See* Tex. Fam. Code § 161.001(b)(1)(D)–(E), (b)(2), (f).

In two appellate issues, Father challenges the sufficiency of the evidence supporting the jury's endangerment, best interest, and continuing-danger findings.[2]  We will affirm.

---

[1]To protect the child's identity, we refer to him using an alias and to other family members by their relationship to the child.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The parent–child relationship between Mother and Ryan was also terminated, but she did not appeal the termination order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother began a dating relationship in 2014. They both struggled—before and throughout their relationship—with drug addiction, criminal conduct, and mental health that led to the Department's involvement before and after Ryan's birth.[3]

Ryan was born in 2016 while Father was incarcerated for assault and possession of a controlled substance. In 2019, during Father's incarceration, the Department investigated Mother's supervision of Ryan and her other children. Following Mother's positive test for methamphetamine, the Department temporarily removed the children from her care.[4] The Department provided Mother with a service plan, which she completed, and the children were returned to her care in November 2020. Father was released from incarceration the following month, and he returned to Mother and Ryan.[5]

In February 2021, Mother relapsed and began using methamphetamine. Father was aware that she had relapsed, but he allowed Ryan to remain in her care and took no action to protect him. In 2022, Father also relapsed and began using

---

[3]Father and Mother each had three children from prior relationships. In 2014, the Department found that Father and Mother—because of their drug use—had neglected Mother's other children. Father's older children did not live with him.

[4]Father was notified of Ryan's removal and the adversary hearing, but—as he was incarcerated—he did not appear.

[5]During his 2016–2020 incarceration, Father had made no effort to contact or to be involved in Ryan's life.

methamphetamine. Following his relapse, he assaulted Mother and was convicted of family violence. Father and Mother separated, but she allowed him to come over and stay overnight with Ryan when she traveled for work. Father and Mother eventually briefly regained sobriety.

In 2024, Mother relapsed again and began using methamphetamine and hydrocodone. Father was aware of Mother's relapse, but he allowed Ryan to remain in her care and took no action to protect him. In April 2024, Mother and Ryan were evicted from her home, and they moved into a motel room for several months. Father lived with his parents during this time, but he would stop by the motel from time to time to visit Ryan.

In August 2024, the Department initiated an investigation after receiving intake reports that alleged neglectful supervision and methamphetamine use by Father and Mother while caring for then eight-year-old Ryan. A Department investigator and law-enforcement officers spoke with Mother in her motel room, and she reported that—while she slept—Ryan had wandered around the motel, had knocked on doors, and had climbed up the balcony to the motel's second floor. She also reported that she and Father had recently fought and that he had punched her in the chin and had stolen her phone. She denied any drug use and claimed that she did not know whether Father had used drugs. The investigator also discovered that Ryan was not enrolled in school.

4

A week later, the investigator and law-enforcement officers returned to the motel and found Father, Mother, Ryan, and Mother's nine-month-old grandson inside the room.[6]  Father was sleeping "halfway on the bed, halfway on the floor face down."  Father admitted to the investigator that he had used methamphetamine "two or three days prior."  A law-enforcement officer searched Father and located two grams of methamphetamine in his front pocket, and the investigator drug tested Father, Mother, Ryan, and the nine-month-old child.

Father was positive for methamphetamine and ecstasy, Mother was positive for methamphetamine and hydrocodone, and Ryan and the nine-month-old child were positive for methamphetamine.  The investigator found "reason to believe"[7] that Father and Mother had neglectfully supervised and physically abused Ryan.[8]  That same day, the Department sought—and the trial court granted—emergency temporary conservatorship of Ryan.  The trial court also appointed an attorney ad

---

[6]Ryan had still not been enrolled in school.

[7]See In Re K.N., No. 02-25-00438-CV, 2026 WL 478943, at *5 n.11 (Tex. App.—Fort Worth Feb. 19, 2026, no pet.) (mem. op.) (explaining that after investigating allegations of child abuse or neglect, the Department will assign one of five possible dispositions, of which "reason to believe" is based on a preponderance of the evidence).  Previous Department investigators had made fourteen "reason to believe" findings that a child in Father's or Mother's care had been abused or neglected.

[8]The investigator explained at trial that a child's ingestion of methamphetamine "can cause behavioral issues, attention span issues, health issues," and withdrawal symptoms.

5

litem and a guardian ad litem (CASA) to represent Ryan's interests. At Mother's request, Ryan was placed with her cousins (Cousins).

In light of the circumstances surrounding Ryan's removal, Father and Mother were charged with child endangerment.[9] Unrelated to the child-endangerment charge, Father was also arrested for six felony theft cases a week after the removal and incarcerated from August 2024 until November 2025.[10] A Department caseworker visited Father each month during his incarceration and explained to him the various classes and services that he needed to complete. Following his release, Father produced a negative drug test and participated in two visitations with Ryan. The parental-rights case proceeded to trial later that month.[11]

Mother testified that she and Father used methamphetamine before and after Ryan's birth. She admitted that she had relapsed seven to nine times, that she had

---

[9]A person commits the offense of endangering a child if "the person intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child . . . in imminent danger of death, bodily injury, or physical or mental impairment." *See* Tex. Penal Code § 22.041(c). It is presumed that a person engaged in conduct that places a child in imminent danger of death, bodily injury, or physical or mental impairment if "the person's conduct related to the proximity or accessibility of the controlled substance methamphetamines to the child . . . and an analysis of a specimen of the child's . . . blood, urine, or other bodily substance indicates the presence of methamphetamines in the body of the child." *See id.* § 22.041(c-1)(2).

[10]Father explained that he had stolen "[a]ir conditioners and all sorts of big stuff" from Lowe's on multiple occasions to support his drug addiction.

[11]Father was released on November 3, and the termination of parental-rights trial began on November 17.

6

never successfully completed a drug-treatment program, and that she was unconcerned with her failure to complete a drug-treatment program. She explained that she and Father had relapsed in February 2021 and that they had started smoking methamphetamine together, but she maintained that their drug use never affected their ability to care for Ryan. She noted that Father had been sober for the last fifteen months but then agreed that "it's actually 15 days if you don't count the time he's been incarcerated." Mother also recalled two incidents of domestic violence when Father had assaulted her by striking her in the head.

Father confirmed that he and Mother had used methamphetamine, explaining that he had abused opioids and smoked methamphetamine and that he had relapsed several times. He agreed that there was a difference in maintaining sobriety while incarcerated versus being out, noting the last time he had maintained sobriety for fifteen months was during his prior incarceration and then for a while following his release. He claimed that he was different now but that he could not explain it.

Father admitted that he knew Mother had relapsed but reasoned that he did not report it because, in his view, "she wasn't like, under the influence." Father agreed that he had put Ryan at risk by possessing methamphetamine around him but disagreed that he had placed Ryan in danger by leaving him in Mother's care following her relapses. He maintained that he and Mother did not use methamphetamine in the motel room around Ryan and that it was very unlikely he or Mother had exposed Ryan to any methamphetamine, explaining that Ryan's methamphetamine exposure

7

could have come from "the blankets, the sheets, everything at the motel . . . because they don't clean their stuff good there."

He also admitted to an extensive criminal history, including numerous convictions for assault, theft, burglary, trespassing, and drug possession.[12] Father explained that methamphetamine can make anybody aggressive and that his criminal conduct had caused him to be incarcerated for much of Ryan's life. He explained that he had been diagnosed as bipolar and had been prescribed psychiatric medication but that upon his release from incarceration, he had stopped taking the medication and had failed to contact his mental healthcare provider.[13]

Father ultimately conceded that, due to his and Mother's conduct, "[Ryan], in his nine years of existence, ha[d] spent over 900 days in foster care."[14] Father admitted that he and Mother were "always going to be addicts," but he maintained that their drug use had never affected their ability to parent or care for Ryan. He also claimed that he had no concerns with Mother's parenting abilities and that "she's doing everything she needs to do."

---

[12]Father had been "booked into Wichita County jail 26 times in [his] life. He had also forged a prescription for a controlled substance.

[13]Father's mental health records document that he reported "seeing shadows and auditory hallucinations" and note prior diagnoses of intermittent explosive disorder, psychoactive substance abuse, and post-traumatic stress disorder.

[14]Ryan was nine years old at the time of trial.

8

Father agreed that Ryan is safe and properly cared for by Cousins but expressed his belief that Ryan does not "ha[ve] a good life" with them. He testified that he had a full-time job working for a tree-trimming service and that he planned to obtain a vehicle and housing, explaining that if Ryan were returned to him, they would move into his parents' house.[15] Father asserted that it was not in Ryan's best interest to terminate their parent–child relationship.

As an initial matter, the caseworker addressed several concerns about Father and Ryan's parent–child relationship. She testified that—contrary to Father's claim— for Ryan to test positive for methamphetamine, he "would have had to inhale it, ingest it somehow." Before entering the Department's care, Ryan had severe deficits in education, a significant speech impediment, issues with behavioral regulation, and a lack of basic dental hygiene. She also noted that Ryan had engaged in "parentifying" behaviors with Father during their two visitations. For example, Ryan began saving his food "because he want[ed] to make sure his dad was fed."

The caseworker explained that she had developed service plans for Father and Mother, that the service plans were not mere checklists, and that a parent's completion of the plan did not necessarily mean that the parent was safe to reunify with the child. While incarcerated, Father had completed substance abuse and

---

[15]Father earlier admitted to having relapsed while living at his parents' house.

relapse-prevention classes, parenting classes, anger-management classes, and a psychological evaluation by a licensed professional counselor.

The counselor noted in her psychological evaluation that Father's drug use had caused difficulties in his interpersonal relationships or in work performance, that his current functioning was probably compromised, and that he might struggle to reduce his drug use despite repeated attempts. She also noted that Father appeared self-centered and chronically angry and that he was likely to be impulsive and hostile. She recommended that Father attend individual therapy to develop adaptive coping strategies and engage in healthy decision making; participate in substance-abuse treatment, including "a 12-step self-help group"; complete the drug screening program; and attend training focusing on appropriate parenting practices.

Despite Father's completion of the various classes, the caseworker expressed continuing "major concerns" regarding his inability to be honest about his behaviors or to identify the safety risks associated with being an addict. She noted that Father had minimized the impact of his drug use on Ryan's physical or emotional well-being. Further concerns included Father's decision to stop taking his psychiatric medication and his refusal to see a mental healthcare provider following his release from incarceration. Father's attitude reflected that he did not "understand what [it was] going to take to keep [Ryan] safe in the future."

The caseworker noted that Ryan was well bonded with Cousins and that they wanted to adopt him if the termination was granted. She concluded that it was in

10

Ryan's best interest to terminate Father's and Mother's parent–child relationship with Ryan so that he could have "finality and a permanent home" with Cousins, where his needs were being met, and where he experienced stability, safety, and normalcy.

The CASA testified that since Ryan's removal and placement with Cousins, he had made significant progress in his education, speech, and behavior. Cousins had done everything for Ryan, and the CASA had no concerns about their ability to provide permanent care for him. The CASA testified that it was in Ryan's best interest to terminate Father's and Mother's parent–child relationship with Ryan so that he could be adopted by Cousins.

The jury unanimously found, among other things, that (1) the Department had made reasonable efforts to return Ryan to Father, and despite those reasonable efforts, a continuing danger remained in the home that prevented Ryan's return; (2) Father had knowingly placed or knowingly allowed Ryan to remain in conditions or surroundings that endangered his physical or emotional well-being; (3) Father had engaged in conduct or knowingly placed Ryan with persons who engaged in conduct that endangered his physical or emotional well-being; and (4) termination of the parent–child relationship between Father and Ryan was in Ryan's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D)–(E), (b)(2), (f).

11

Following the jury's verdict, the trial court signed an order terminating the parent–child relationship between Father and Ryan.[16] Father moved for a new trial in which he challenged the legal and factual sufficiency of the evidence "to support any of the enumerated termination grounds and to support a finding that termination is in the child's best interest" and appealed.

## III. DISCUSSION

Father argues that the trial court erred by terminating his parent–child relationship with Ryan because the evidence was legally and factually insufficient to support the jury's endangerment, continuing-danger, and best-interest findings under Texas Family Code Section 161.001(b) and (f). *See id.* He further argues that under Article I, Section 37 of the Texas Constitution, we should apply "a strict scrutiny standard of review when evaluating the State's attempts to permanently and irrevocably destroy [a] constitutionally protected relationship." *See* Tex. Const. art. I, § 37.[17]

We first set forth the applicable law and standards of review, followed by preservation of error. Because Father challenges the applicable standard in part of his first issue, we will review it in our "standards of review" section.

---

[16]The jury made the same findings as to Mother, and the trial court terminated the parent–child relationship between her and Ryan.

[17]Briefing on this issue has been raised in amicus briefs and post-submission briefing in a case currently pending in the supreme court. *See In re K.N.*, No. 24-0881.

12

## A. APPLICABLE LAW

When the Department files a suit seeking termination of the parent–child relationship for more than one parent of the child, the trial court "may order termination of the parent–child relationship for the parent only if the court finds by clear and convincing evidence grounds for the termination of the parent–child relationship for that parent." Tex. Fam. Code § 161.206(a-1). The Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *Z.N.*, 602 S.W.3d at 545. Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

## B. STANDARDS OF REVIEW

### 1. Legal Sufficiency

To determine whether the evidence is legally sufficient in parental-rights-termination cases, we look at all the evidence in the light most favorable to the

challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## 2. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the grounds for termination. Tex. Fam. Code § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a

14

firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 3. Standard for Termination of a Parent–Child Relationship

In part of his first issue, Father argues that termination of his parent–child relationship with Ryan must satisfy strict scrutiny. In other words, he argues that the parent–child relationship cannot be terminated unless termination is the least restrictive means to satisfy a compelling governmental interest. Father relies on the recent addition to the Texas Constitution, which reads:

> To enshrine truths that are deeply rooted in this nation's history and traditions, the people of Texas hereby affirm that a parent has the responsibility to nurture and protect the parent's child and the corresponding fundamental right to exercise care, custody, and control of the parent's child, including the right to make decisions concerning the child's upbringing.

Tex. Const. art. I, § 37.

Father did not complain to the trial court either before or after the final order that termination must satisfy strict scrutiny. To preserve a complaint for appellate review, the record must show, among other things, that the party timely complained to the trial court and "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a). Accordingly, this issue is not preserved for our review. *See In re Z.D.*, No. 05-25-00138-CV, 2025 WL 2211477, at *9 (Tex. App.—Dallas Aug. 4, 2025, pet.

15

denied) (mem. op.) (holding that parent must complain to trial court first to preserve argument that termination must satisfy strict scrutiny); *see also In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003) (concluding that a parent in parental-rights termination suit failed to preserve constitutional due-process complaint where not raised in trial court).

Moreover, even if this complaint had been preserved for our review, we conclude that existing protections sufficiently safeguarded Father's constitutional rights, and we decline to apply a strict-scrutiny review to the trial court's termination order.

First, we note that although the constitutional amendment is new, our state's recognition of a parent's "fundamental right to exercise care, custody, and control" is not. Tex. Const. art. I, § 37. Section 37 tracks the language of our jurisprudence. The Texas Supreme Court has long recognized that parents have the "fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *A.B.*, 437 S.W.3d at 502 (quoting *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000); and citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). Section 37 "affirm[s]" that right.

Further, when deciding whether a statute or the state's conduct unduly infringes on the fundamental rights of parents, the Texas Supreme Court has never applied strict scrutiny. *See In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (avoiding determination of which standard applied and concluding "because the facts here are virtually the same [as in *Troxel*], the judgment must be the same too"); *In re*

16

*C.J.C.*, 603 S.W.3d 804, 814 n.49 (Tex. 2020) (same); *In re H.S.*, 550 S.W.3d 151, 175 (Tex. 2018) (Blacklock, J., dissenting) ("While the Supreme Court has broadly recognized the constitutional interest of parents in the care, custody, and control of their children, the Court has not articulated a standard of review by which to judge the constitutionality of infringements upon parents' rights.").

In any event, the best-interest analysis necessarily implicates whether termination of the parent–child relationship is the least-restrictive means to accomplish the compelling governmental interest in protecting the children. *See In re M.B.*, —— S.W.3d ——, ——, No. 14-25-00418-CV, 2025 WL 3275376, at *16 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet. h.) ("Mother's argument that termination was not the least restrictive solution or was not narrowly tailored is considered in various factors of the best-interest analysis."); *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 139 (Tex. App.—El Paso 1997, no writ) ("[T]he requirement to show that the termination is in the best interest of the child coupled with the clear and convincing standard of proof . . . guarantees the constitutionality of termination proceedings. A separate consideration of alternatives to termination is not required."), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256; *cf. In re S.H.A.*, 728 S.W.2d 73, 91 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (noting that "severance of the parent–child relationship will survive constitutional scrutiny only if . . . it is impossible to achieve the goal through any less restrictive means").

Because the best-interest analysis and clear-and-convincing-evidence standard "guarantee[] the constitutionality of termination proceedings," *Edwards*, 946 S.W.2d at 139, we decline to apply a separate strict-scrutiny review to a final order terminating a parent–child relationship.

We overrule this portion of Father's first issue.

## C. PRESERVATION OF ERROR

In part of his first issue, Father challenges the legal and factual sufficiency of the evidence to support the continuing-danger finding.

In addition to our general preservation rules above, we have previously recited the following requirements when challenging jury findings:

> In order to preserve a legal sufficiency challenge on appeal following a jury trial, Appellant must raise the challenge with the trial court in one of the following ways: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict (JNOV); (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.); *see also* Tex. R. Civ. P. 324(b) (listing appellate complaints that must be preserved by a motion for new trial); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992). After a jury trial, factual sufficiency challenges must be raised in a motion for new trial. Tex. R. Civ. P. 324(b)(2)–(3); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

*In re C.Y.*, No. 02-15-00152-CV, 2015 WL 6394559, at *2 (Tex. App.—Fort Worth Oct. 22, 2015, no pet.) (mem. op.) (concluding that parent failed to preserve his appellate complaint after termination-of-parental-rights jury trial by failing to file a

18

motion for instructed verdict, a motion for JNOV, a motion to disregard the jury's answer, or a motion for new trial raising sufficiency of the evidence to support the finding challenged on appeal and his challenge to the question's inclusion in the jury charge did not comport with his appellate argument).

Father complained in his motion for new trial that "[t]he evidence supporting termination is legally and factually insufficient to support any of the *enumerated termination grounds* and to support a finding that termination is in the child's best interest." [Emphasis added.] The trial court's judgment lists Subsections (D) and (E) as the enumerated termination grounds as to Father, while in a different portion of the judgment, the trial court made its recitation of the jury's continuing-danger finding that Father now attempts to challenge.

The record reflects that the jury answered affirmatively to question 5, which asked, "Do you find by clear and convincing evidence that the [D]epartment made reasonable efforts to return the child to [Father] and despite those reasonable efforts, a continuing danger remains in [Father's] home that prevents the child's return, or that reasonable efforts to return the child to [Father] were waived?" Although Mother raised sufficiency complaints to some of the charge's questions and moved for a directed verdict on the endangerment and best-interest questions as to her, Father did not object to the sufficiency of the evidence to support jury question 5's submission—or to any other portion of the charge—during the charge conference, he did not move for a directed verdict or JNOV on jury question 5, he did not move to

19

disregard the jury's finding on question 5, and—as set out above—he did not challenge it as one of his legal-and-factual-sufficiency grounds in his motion for new trial. Accordingly, we conclude that Father has failed to preserve his legal-and-factual-sufficiency complaint as to Subsection (f). *See id.* at \*2–3; *see also In re B.L.D.*, 113 S.W.3d 340, 353–55 (Tex. 2003) (discussing preservation-of-error requirements in parental-rights-termination cases).

We overrule this portion of his first issue.

### D. ENDANGERMENT FINDINGS

In the remainder of his first issue, Father challenges the jury's endangerment findings under Subsections (D) and (E). Under Subsection (D), he contends that the evidence is legally and factually insufficient to prove that he knowingly placed or knowingly allowed Ryan to remain in conditions that endangered his physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D). Under Subsection (E), he contends that the evidence is legally and factually insufficient to prove that he engaged in conduct or knowingly placed Ryan with persons who engaged in conduct that endangered his physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

### 1. Case Law on Subsection (D) and (E) Endangerment Grounds

When a parent challenges Subsection (D) and (E) findings, due process and due course of law demand that we address the findings and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019).

"'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under Subsection (D), we must examine the evidence related to the child's environment to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* The relevant timeframe for an environment-based endangerment finding under Subsection (D) is prior to the child's removal. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). A parent's illegal drug use and drug-related criminal activity "likewise support[ ] the conclusion that the children's surroundings endanger their physical or emotional well-being." *J.T.G.*, 121 S.W.3d at 125.

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. But endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth,

21

while the parent had custody of older children, including evidence of drug use. *J.O.A.*, 283 S.W.3d at 345. We may consider conduct that occurred outside the child's presence in our review. *In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at *8 (Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.).

## 2. Subsections (D) and (E)

Father argues that legally and factually insufficient evidence was presented to support the jury's finding that Father violated the predicate grounds of endangering conduct. Specifically, he asserts that "the Department presented no evidence that Father knowingly placed or allowed [Ryan] to remain in endangering conditions, where there was no evidence Father knew Mother was using drugs." The record belies his lack-of-knowledge assertion.

Mother testified that she relapsed more than five times since Ryan's birth, that she used methamphetamine while caring for him, and that because of her relapses, it was unsafe for Ryan. Regarding Father's knowledge of her relapses and continued drug use while caring for Ryan, Mother testified to the following:

Q And did he know you were using drugs?

A When he -- when he came over and I relapsed in 2024?

Q Yes, ma'am.

A I had told him and he helped me get –

Q When did you tell him?

A One of the nights that he stopped by.

22

Q  Like shortly after the relapse in 2024 or closer to removal in 2024?

A  After the relapse?

Q  Okay.  So he knew from the beginning of 2024 because you told him that you had relapsed on drugs and were using meth?  Is that yes or no?

A  Yes.

And Father confirmed his knowledge of Mother's relapses and continued drug use and his leaving Ryan in her care:

Q  [Mother] said or testified on the stand that she told you she had used meth again and after that point in time, you left her in the -- you left [Ryan] in her care; is that correct?

A  Not like -- she wasn't, like, under the influence.

Q  But you knew that she had -- she had relapsed?

A  Right, but she wasn't under the influence.

. . . .

Q  Yeah. And when the children -- when [Ryan] was removed by the department in [2019], did [Mother] ever make you aware that the children -- that your son had been removed from her care and was in foster care?

A  Yeah, because she went to -- she was going to rehab.

Q  Okay.  So you were aware that [Ryan] was removed, right?

A  Right.

Q  And then you were aware that after that, she relapsed, correct?  After she got [Ryan] back, you knew that she had relapsed?

A  Yes.

23

Q  But you still didn't take any affirmative action to do anything to protect [Ryan] at that time, did you?

A  Yes.

Q  Did you -- you called her in for that relapse?

A  No, I didn't like that, no.

Despite the Department's prior intervention, Father continued to allow Ryan to be exposed to endangering conditions.  He knowingly placed or knowingly allowed Ryan to remain in conditions that endangered his physical or emotional well-being by leaving him in the care of Mother—a known drug addict who had a pattern of continued drug use and neglect.  "Evidence that a parent left [his] child in the care of a known drug user supports an endangerment finding under Subsection (D)." *In re Z.R.*, No. 02-25-00268-CV, 2025 WL 3181160, at *8 (Tex. App.—Fort Worth Nov. 13, 2025, no pet.) (mem. op.); *see In re M.M.*, No. 2-08-275-CV, 2009 WL 2196129, at *8 (Tex. App.—Fort Worth July 23, 2009, no pet.) (per curiam) (mem. op.) (holding evidence of father's knowledge of mother's drug use was legally and factually sufficient to support finding under Subsection (D)); *In re A.O.*, No. 2-09-005-CV, 2009 WL 1815780, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.) (holding father's knowledge of mother's use of drugs and failure to take steps to protect the child from such endangering environment was sufficient to support finding under Subsection (D)); *see also In re B.L.H.*, 609 S.W.3d 271, 279 (Tex. App.—Texarkana 2020, pet. denied) (holding the evidence legally and factually sufficient to

24

support the trial court's Subsection (D) finding where mother left child in the care of her methamphetamine-user brother while she smoked marihuana outside of the home and also chose to date a boyfriend who used methamphetamine with her while the child was in the home).

Whether we view the evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018), a reasonable factfinder could form a firm belief or conviction that Father knowingly placed or knowingly allowed Ryan to remain in conditions or surroundings that endangered his physical or emotional well-being. Thus, the evidence is legally and factually sufficient to support the jury's endangerment finding under Subsection (D). *See* Tex. Fam. Code § 161.001(b)(1)(D); *In re S.M.*, No. 02-23-00079-CV, 2023 WL 4501821, at *5 (Tex. App.—Fort Worth July 13, 2023, no pet.) (mem. op.) ("Because the record demonstrates that Mother's past conduct subjected the children to a life of uncertainty and instability and because we may infer that similar conduct will recur if the children were returned to Mother, we conclude that legally and factually sufficient evidence supports the endangering-conduct predicate ground.").

Further, Father's appellate brief seemingly concedes Subsection (E)—that he engaged in conducted that endangered Ryan—stating that "[i]t may be legally sufficient under (E) that Father knowingly engaged in conduct that endangered [Ryan] when he possessed methamphetamine in the same motel room with [Ryan] at

25

removal, where [Ryan] tested positive for methamphetamines." In any event, his testimony established that he had engaged in conduct that endangered Ryan.

Q Do you think you put [Ryan] at risk by bringing drugs around him?

A Me?

Q Yeah.

A Yes.

In light of Father's attitude and other conduct set out above, we conclude that the evidence is legally and factually sufficient to support the jury's Subsection (E) finding. *See In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024) (stating that Subsections (D) and (E) have to be reviewed).

We overrule the remainder of Father's first issue.

## D. BEST-INTEREST FINDING

In his second issue, Father challenges the legal and factual sufficiency of the jury's finding that termination of the parent–child relationship between him and Ryan was in Ryan's best interest. *See* Tex. Fam. Code § 161.001(b)(2). We review this challenge under the same review standards outlined above. Although we generally presume that keeping a child with his parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239,

26

249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We further consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires,

- the child's emotional and physical needs now and in the future,

- the emotional and physical danger to the child now and in the future,

- the parental abilities of the individuals seeking custody,

- the programs available to assist these individuals to promote the child's best interest,

- the plans for the child by these individuals or by the agency seeking custody,

- the stability of the home or proposed placement,

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one, and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re Z.G.*, No. 02-23-00038-CV, 2023 WL

27

3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.); *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.).

### 1. Ryan's Desires

Although Ryan did not testify at the termination trial, the CASA reported that he was "happy with [Cousins], although he wish[ed] to be home with [Mother]." The CASA also reported that Ryan had "processed his feelings related to being separated from his birth parents and that he reports he's happy, but he is happiest when he sees his birth mother." There is no evidence, however, of Ryan's respective desires regarding the termination of his parent–child relationship with Father. Accordingly, because there is evidence of Ryan's desires as to Cousins and Mother without reference or mention to Father, we conclude that this factor weighs slightly in favor of the jury's best-interest finding.

### 2. Ryan's Emotional and Physical Needs

Children need permanency and stability. *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). By the time he was nine years old, Ryan had spent over 900 days in foster care because of Father's and Mother's behavior, and Father conceded that Ryan's placement in foster care was not "good parenting."

The caseworker testified that Father and Mother had provided Ryan with little stability over the course of his life but that Cousins had provided him with stability, safety, and normalcy. Conversely, Father and Mother had not "shown [her] any

28

resources that they possess or support to ensure that [Ryan] can grow up to be a successful person" or "that they can provide or ever have provided [him] a stable home."

She explained that Ryan had specialized mental health or emotional needs but that Father did not meet those specialized needs. Rather, he had remained absent for much of Ryan's life and had allowed Mother—a relapsed drug addict—to care for him. Mother's "care" not only failed to meet Ryan's specialized needs but also failed to meet his basic needs, such as dental hygiene. By contrast, the caseworker testified that Ryan was in a stable placement with Cousins and that all of his needs were being met. *See In re J.S.*, 687 S.W.3d 541, 554 (Tex. App.—Eastland 2024, no pet.) (holding that trial court properly found that it was in children's best interest "to have sober and drug-free caregivers"); *In re A.H.*, No. 02-21-00402-CV, 2022 WL 1682422, at *11 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.) (holding that trial court could have inferred from mother's past history of drug use that she did not have the ability to meet children's physical and emotional needs in the future).

Accordingly, we conclude that this factor weighs strongly in favor of the jury's best-interest finding. *See Z.R.*, 2025 WL 3181160, at *11 (weighing needs factor in favor of termination where "some evidence indicated that [m]other could meet the [c]hildren's emotional and physical needs" but "ample testimony showed that [adoption-motivated placement] could meet all of [their] needs"); *A.P.*, 2022 WL 16646478, at *10 (holding that needs factor weighed in favor of termination where a

29

caseworker testified that children "required more attention and a keener eye than other children in her caseload," neither parent was able to provide necessary level of care, and children's then-current placements were able to meet their physical and emotional needs).

### 3. Emotional and Physical Danger to Ryan

Evidence of emotional and physical danger to Ryan included that Father:

- accrued an extensive criminal history;

- committed multiple felony criminal offenses following his release from incarceration—including theft and possession of a controlled substance;

- assaulted Mother on several occasions;

- tested positive for methamphetamine and ecstasy while caring for Ryan;

- possessed methamphetamine while with Ryan;

- caused Ryan to ingest or inhale methamphetamine;

- failed to provide Ryan with dental care;

- failed to enroll Ryan in school;

- failed to pursue treatment for Ryan's speech impediment;

- repeatedly relapsed and failed to maintain sobriety;

- allowed Ryan to remain in Mother's care despite her relapses and drug use;

- minimized the effect his drug use had on his ability to care for Ryan;

- suffered from bipolar disorder, intermittent explosive disorder, psychoactive substance abuse, and post-traumatic stress disorder;

- stopped taking his prescribed psychiatric medication; and

- failed to meet with his mental health provider.

The jury could have reasonably inferred that Father's turbulent and unpredictable relationship with Mother and his continued drug use and criminal conduct could endanger Ryan emotionally and physically were he returned to Father. *See In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.); *see also In re D.S.*, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.) ("Evidence of a parent's long-term drug use and unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest."); *In re M. H.*, No. 02-22-00048-CV, 2022 WL 2840266, at *6 (Tex. App.—Fort Worth July 21, 2022, no pet.) (mem. op.) ("Mother's on-again/off-again relationship with [the father of another one of her children] evinced not only an unstable home life but also the emotional and physical danger to [her older child] should she be placed with Mother."). By contrast, there is no evidence in the record that Cousins posed any threat of emotional or physical danger to Ryan. *Cf. G.M.*, 2023 WL 4243349, at *8. Accordingly, we conclude that this factor weighs in favor of the jury's best-interest finding.

### 4. Parental Abilities

Father claimed, "I'm different. I don't know. I can't explain it." But the jury had to weigh that testimony against the evidence of his inability to maintain sobriety and to refrain from criminal conduct. The jury could have also considered Father's failure to grasp the consequences of his and Mother's drug use. As outlined above, Father allowed Ryan to remain in Mother's care despite his knowledge that she was using methamphetamine and hydrocodone. Father excused the behavior because it was "[n]ot like – she wasn't, like, under the influence."

The caseworker expressed continuing "major concerns" regarding Father's inability to be honest about his behaviors or to identify the safety risk of being an addict. Father minimized the impact that his substance abuse has had on Ryan, and his attitude reflected that he did not "understand what [it was] going to take to keep [Ryan] safe in the future." Conversely, the testimony about Cousins' parental abilities was universally positive, including Father's testimony that Ryan was safe and properly cared for by them. Accordingly, we conclude that this factor weighs in favor of the jury's best-interest finding.

### 5. Programs Available

There was scant evidence of programs available to assist Cousins, but the evidence that they could meet all of Ryan's needs and that he was thriving in their care was uncontroverted, and there was no evidence that Cousins needed or would need any assistance with raising Ryan. *See In re P.W.*, No. 02-24-00211-CV, 2024 WL

32

4293564, at *12 (Tex. App.—Fort Worth Sept. 26, 2024, no pet.) (mem. op.) (holding that "this factor weigh[ed] slightly in favor of termination" where there was little evidence of programs available to assist foster parents to promote child's best interest but caseworker testified that foster parents had been meeting child's medical, physical, emotional, financial, and developmental needs and foster mother "testified that she and her husband were fine with adopting with no expectation of assistance at all and that she was confident that they can meet those needs if something should later arise").

By contrast, the caseworker testified that although Father had completed parenting packets and classes while incarcerated, she still had concerns about his ability to be a safe parent. Specifically, Ryan's safety had never been Father's priority, and Father demonstrated that he lacked accountability and understanding of how his drug use, domestic violence, and incarceration had affected Ryan. Further concerns included that Father had stopped taking his prescribed psychiatric medication and had failed to meet with his mental health provider. With respect to his service plan, Father could not complete it due to his incarceration for the duration of the case. *See C.W.*, 2022 WL 123221, at *9–11 (holding that the programs-available factor slightly favored trial court's best-interest finding where the Department caseworker testified "that Mother would complete services so that she could check the box showing that she had complied, but despite completing the services and checking the box, Mother could not show that she had learned anything"); *In re A.W.*, No. 02-21-00058-CV,

33

2021 WL 3204955, at *15 (Tex. App.—Fort Worth July 29, 2021, pet. denied) (mem. op.) ("Mother had a home and a job with which to support [her child], and she had 'completed service plan after service plan,' but the trial court could have found that completing the plan was not the same as learning from the plan and breaking a lifetime's worth of habits."). The jury was entitled to take into account the family's lengthy history with the Department, including the fact that Father had not changed his conduct after his previous incarcerations and the Department's prior removal of Ryan. Accordingly, we conclude that this factor weighs in favor of the jury's best-interest finding.

### 6. Plans for Ryan

Cousins wished to adopt Ryan, and they were able to meet all of his needs. The caseworker testified that Cousins cared, loved, and desired to adopt Ryan and that their other children were well-bonded with him. The caseworker explained that she had no concerns regarding their care and that their home was well suited for him. Cousins, among other things, enrolled Ryan in school, supervised him, and pursued treatment for his speech impediment. While in their care, Ryan made significant progress in his education, speech, behavioral regulation, and dental hygiene. He also, for the first time, engaged in organized sports and went on vacation.

Father's plan, on the other hand, was for him and Ryan to move into his parents' house. But Father had previously relapsed while living at his parents' house, and he had failed to demonstrate that he could provide Ryan with a safe, stable living

34

environment. Beyond living with his parents, Father offered no specific plans for Ryan's care if he was returned to him.

Accordingly, we conclude that this factor weighs in favor of the jury's best-interest finding. *See P.W.*, 2024 WL 4293564, at *12–13 (concluding that plans factor favored termination where parents had difficulty articulating their future plans for child and foster parents were adoption-motivated); *G.M.*, 2023 WL 4243349, at *9 (stating that this factor weighed "slightly in favor of termination" where "Mother's plan was less well-defined than the Department's"); *A.P.*, 2022 WL 16646478, at *11–12 (holding evidence legally and factually sufficient to support best-interest finding where "Mother wanted the Children back in her custody, but she had no specific plans for them if she regained custody").

### 7. Stability of the Home/Proposed Placement

"Stability and permanence are paramount in the upbringing of children." *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). The evidence of the stability of Cousins' home was uncontroverted. And as noted, Father's testimony confirmed that Cousins had provided Ryan with safety and proper care.

In contrast, Father's life provided little evidence of stability. He was released from incarceration two weeks before trial, and although he had secured a job at a tree-trimming service, he did not have a vehicle or permanent housing. Moreover, Father's recent past was characterized by instability—recurring relapses, criminal

35

conduct, and incarceration. *See A.P.*, 2022 WL 16646478, at *11. We have recognized that a parent who is unstable himself cannot offer his child stability. *See id.* Accordingly, we conclude that this factor weighs in favor of the jury's best-interest finding.

### 8. Father's Acts or Omissions

The fact that Ryan tested positive for methamphetamine indicated that Father's parent–child relationship with Ryan was not proper. *See M. H.*, 2022 WL 2840266, at *2–3. Father admitted to possessing methamphetamine in Ryan's presence, leaving Ryan in the care of a relapsed drug addict, committing acts of domestic violence, and remaining absent for most of Ryan's life. Father also repeatedly minimized the impact of his and Mother's drug use on their ability to care for Ryan.

Indeed, some evidence suggested that Father's parent–child relationship with Ryan was proper. He had two visitations with Ryan during the pendency of this case, there was no evidence that he missed any visits, and according to the caseworker, the visits were appropriate. But the caseworker also testified that Father was "not able to identify the safety risks with the issues that can come along with being an addict." Accordingly, we conclude that this factor weighs strongly in favor of the jury's best-interest finding.

### 9. No Excuses for Father's Conduct

Father offered little in the way of excuses for his troubling acts and omissions. *Cf. G.M.*, 2023 WL 4243349, at *10 ("The record contains little as far as excuses for

[m]other's acts and omissions. . . . This factor supports termination."). Rather, he attempted to minimize the effects that his conduct had on his ability to care for Ryan.

The jury was not compelled to believe Father's minimization of his conduct. *See K.A.*, 2023 WL 2429793, at *8 ("Despite [m]other's numerous denials, a factfinder is not compelled to believe testimony that comes from a biased or an interested source."). Accordingly, we conclude that this factor weighs in favor of the jury's best-interest finding.

### 10. Evidence Supporting Best-Interest Finding Sufficient

In sum, although some of the *Holley* factors weigh less strongly in favor of termination than others, not one of the nine factors weighs against the jury's best-interest finding. Viewing the evidence in the light most favorable to the jury's best-interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of the parent–child relationship between Father and Ryan was in Ryan's best interest. *See J.F.C.*, 96 S.W.3d at 266. Further, based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19; *see also In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503, at *10 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.).

We overrule Father's second issue.

37

## IV.  CONCLUSION

Having overruled Father's two issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  May 21, 2026